RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0198p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ARIEL SCHLOSSER,

*Plaintiff-Appellee*,

No. 23-6019

*v.*

VRHABILIS, LLC,

*Defendant-Appellant*.

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:20-cv-00190—Travis Randall McDonough, District Judge.

Argued: July 17, 2024

Decided and Filed: August 26, 2024

Before: BOGGS, CLAY, and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Bryce E. Fitzgerald, KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellant. G. Brandon Hall, THE EMPLOYMENT & CONSUMER LAW GROUP, LLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Bryce E. Fitzgerald, George R. Arrants, Jr., KRAMER RAYSON LLP, Knoxville, Tennessee, for Appellant. G. Brandon Hall, Lauren Irwin, Emily Costanzo, THE EMPLOYMENT & CONSUMER LAW GROUP, LLC, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

CLAY, Circuit Judge. After a four-day trial and multiple days of deliberations, a jury found that Plaintiff Ariel Schlosser proved by a preponderance of the evidence that her former

employer, VRHabilis, LLC ("VRH"), subjected her to a hostile work environment on the basis of her sex or gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq*. Following the jury's verdict, VRH filed a renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, arguing that the evidence could not support the jury's verdict in favor of Schlosser. The district court denied the motion, and VRH timely appealed. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual Background

In May 2016, VRH hired Schlosser to perform unexploded ordnance ("UXO") remediation at Cape Poge, an island adjacent to Martha's Vineyard. This remediation project required certified divers with weighted suits to extract UXO, such as practice bombs, bullets, or grenades, from the bottom of the sea floor to protect the public around the area. Schlosser was hired as "UXO Technician I," which meant that she could serve as a primary diver, a standby diver, and/or a dive tender. While the primary diver is actually in the water removing UXO, the standby diver and the dive tender perform supportive roles, working to ensure that the primary diver is safe. Each of these roles had a different pay rate; a primary diver would receive the highest amount of compensation, while a dive tender working on the surface would receive significantly less. VRH staffed this project with two teams, each composed of approximately three divers and one diving supervisor. Notably, Schlosser was the lone female diver employed by VRH.

Several key events occurred during Schlosser's first week working for VRH. On or about May 25, 2016, the Diving Program Manager, Scott Alogna, observed Schlosser practicing her knot tying, which is a skill used extensively in diving to secure equipment. Alogna then asked Schlosser to perform a knot test and did not ask the same of any of the male divers. After this test, Alogna instructed Schlosser to practice her knots, making Schlosser feel "uncomfortable" and "singled out." Trial Tr. Vol. I, R. 89, Page ID #3145. Schlosser began to practice her knots as instructed. When Alogna later witnessed her practicing her knot skills in

the work truck, he told her, "[n]ow is not the time to do that. Help your teammates unload the boat." Trial Tr. Vol. III, R. 91, Page ID #3543.

Schlosser then performed her first dive on May 26, 2016. During this dive, Schlosser did not perform as well as she had hoped, failing to meet her targets in clearing UXOs and having to exit the water to add more weight to her weight belt in order to stay near the sea floor. Even though an experienced male diver also exited the water to add weight to his weight belt, only Schlosser was subsequently removed from the dive rotation going forward. VRH leadership instructed the team that Schlosser should not dive and should instead perform the supportive, above-surface tender role for the foreseeable future.

Near the end of her first week, on June 1, 2016, Schlosser received verbal counseling from VRH's COO, Elliot Adler, regarding her work ethic. Adler explained that Schlosser had exhibited a lack of willingness to assist her team and had accomplished very little compared to the rest of her team. To support this counseling, Adler referred to Schlosser tying knots while the rest of the team was unloading the tender as an example of her failure to support her team. Although VRH documented the reasons for Schlosser's counseling on a written form, the form was never provided to Schlosser. At trial, Schlosser testified that several of the highlighted issues on the counseling form never occurred, and that she heard of certain alleged performance problems for the first time in this litigation.

After counseling with Adler, and still during Schlosser's first week of work, Schlosser also heard from a co-worker that VRH wanted to replace her. The jury reviewed text messages in which Ronald Madden, the Project Manager, asked VRH's Head of Human Resources, Diane Backes, to find a replacement UXO Tech I. After Madden specified that he wanted to replace Schlosser, Backes responded, "Oh . . . the female." Pl.'s App'x, ECF No. 22, 11. Madden responded that his replacement decision had nothing to do with gender, but rather Schlosser's performance throughout her first few days on the job. Shortly after these text messages, Madden forwarded Backes a message from Schlosser's dive supervisor, Tyler Sanders, stating that Schlosser "bitch[ed] about everything," "ha[d] a shit attitude," and that he "[didn't] want to have to deal with this when we're supposed to be on our off time." *Id.* at 12. Based on this report from the dive supervisor, Madden then texted Backes, "I'm going to . . . get permission to

purchase a ticket for tomorrow morning pick her up at the safety brief. . . and get her off [the] island." *Id.* When asked about this message during trial, Madden stated that he was merely venting to Human Resources after having a few drinks and did not take any formal action to replace Schlosser.

In addition to Schlosser being prohibited from diving for a period of time, VRH also prohibited her from driving the company vehicle because she got the vehicle stuck in mud by driving off the delineated path. Even though other male divers had also gotten the vehicle stuck, they did not similarly lose their driving privileges. In one instance, a male diver backed the company vehicle into a tree, but he was not disciplined and continued to maintain his driving privileges. When Schlosser lost her driving privileges, she was forced to rely on her male co-workers to drive her to use the restrooms, which were too far away to walk.

Beyond feeling singled out due to the conditions of her work environment, Schlosser experienced significant friction with her dive supervisor, Tyler Sanders. Schlosser testified that Sanders harassed her and cursed at her on a daily basis. At one point, after receiving her counseling from Adler, Schlosser attempted to have a discussion with her teammates. In front of her team, Sanders became confrontational and screamed at Schlosser to stop talking because "[you're] not a real diver." Trial Tr. Vol. I, R. 89, Page ID #3155. Among other obscenities and insults, Sanders also yelled, "[you've] never worked a real job," "[your] opinion doesn't matter," and "shut the f*** up." *Id.* Sanders did not display similar hostility towards the male divers.

Schlosser reported Sanders' harassment to Paul Baril, the Site Manager. Instead of taking any remedial action, Baril told Schlosser that Sanders had insisted that Schlosser should be removed from his diving team. Eventually, on June 17, 2016, Schlosser reported Sanders' harassment to Backes. In relevant part, Schlosser's email stated:

> I am writing to you an official report of what I feel to be recurrent harassment by my superior. I recently reported this to the highest ranking person on the ground out here, yet nothing has been acknowledged on my behalf and no actions are being taken to resolve the issue other than an apparent threat on my job. I felt it necessary for my assurance that I send this directly to you to be documented. No action is necessarily needed, other than a stop to my daily verbal abuse. Once that ends, I have full confidence that my superior, Tyler Sanders and I, will be able to

work together peacefully, respectfully, productively and without fault from here on out.

Pl.'s App'x, ECF No. 22, 40.

Backes forwarded the complaint to Adler, Madden, and Alogna with the opening, "[p]lease [see] the email from Ariel below. I know there has been talk about replacing her . . . ." *Id.* at 39. Backes did not investigate Schlosser's claims herself; instead, Adler and Madden decided to go to the job site and interview Sanders' diving team. After Adler's conversations with the male divers and Schlosser, Adler determined that Sanders had singled Schlosser out and treated her differently than the rest of the team. During his testimony at trial, Adler acknowledged that the investigation was related to gender-based harassment. To prevent future harassment from Sanders, Adler switched Schlosser to a different dive team led by supervisor John Bigos. Sanders did not receive discipline or training related to sexual and gender-based harassment.

Throughout this investigation, Backes attempted to follow up with Schlosser regarding her complaint. Schlosser did not provide Backes with any additional details regarding Sanders' harassment and instead participated in Adler's on-site interviews. At the end of the investigation, on June 24, 2016, Schlosser sent the following email to Backes:

> All issues have been solved swiftly and with great haste. VRHabilis has gone above and beyond to address and alleviate all concerns on my behalf. I am grateful to everyone involved in quickly and efficiently addressing the situation. I am relieved and more than satisfied with the end result. Thank you.

Def.'s App'x, ECF No. 15, 30. During trial, Schlosser testified that the team change was not made as a result of her harassment complaint, but rather Sanders requested that she be removed from his team. The jury reviewed evidence that, one day prior to Schlosser's transfer, Sanders requested that Schlosser receive formal counseling and be removed from his crew.

Schlosser's new team allowed her to dive again, and she dove seven times between June 29, 2016 and July 18, 2016. During many of these dives, Schlosser objectively outperformed several of her male teammates, and the record demonstrates that Schlosser's dive performance improved over time. Nonetheless, on July 18, 2016, Madden sent an email to the diver

supervisors, once again specifically prohibiting Schlosser from diving. Madden based this directive, in part, on Sanders' evaluation of Schlosser as the least productive diver. However, Sanders did not have the opportunity to observe Schlosser's improvement after her transfer away from his diving team. At trial, Madden and Alogna testified that, according to the dive summary, Schlosser was not the least productive diver. They also acknowledged that this least productive diver, unlike Schlosser, was never prohibited from diving.

On her new team, Schlosser also had issues with a male diver, Aaron Brouse. Schlosser testified that, similar to Sanders' harassment, Brouse verbally abused her. On one occasion, Brouse physically pushed her and yelled at her, screaming "nobody f***ing likes you," and calling her a "slimy bitch." Trial Tr. Vol. I, R. 89, Page ID #3173. Brouse also said, "[y]ou want an enemy, I'll give you one. I'll make your life a living hell." *Id.* at Page ID #3176. While this altercation occurred, dive team supervisor Bigos stood in close proximity to the argument but did nothing to stop it. Brouse complained about his arguments with Schlosser to Baril, who asked the parties to provide written statements. Schlosser testified that she declined to do so because she did not want to be blamed for stopping production and was already being constantly scrutinized by VRH management. VRH did not take any subsequent action regarding this incident. Brouse continued to harass Schlosser and again called Schlosser a bitch.

After Brouse continued to berate her, on July 28, 2016, Schlosser emailed Backes a resignation letter that detailed the harassment and discrimination that she experienced during her short ten-week employment with VRH. The email discussed Sanders' and Brouse's insults and harassing behavior, the repeated prohibition of Schlosser from diving, and the various ways in which she felt singled out on the basis of her gender. Schlosser stated, "[m]y gender now feels, in itself, derogatory." Pl.'s App'x, ECF No. 22, 87. After receiving this email, VRH did not investigate Schlosser's allegations. Instead, VRH leadership expressed relief at Schlosser's resignation.

## B. Procedural History

After exhausting her administrative remedies, Schlosser filed this action against VRH in federal court, asserting that VRH engaged in unlawful sex discrimination, created a hostile work

environment, and retaliated against her in violation of Title VII. Following discovery, VRH moved for summary judgment, which the district court denied. The case proceeded to a jury trial involving approximately four days of testimony and three days of deliberations.

At trial, Schlosser recounted several instances of harassment that she experienced. In addition, the jury heard from Human Resources Manager Backes, Diving Program Manager Alogna, COO Adler, and Project Manager Madden. At the close of proofs, VRH made an oral motion for judgment as a matter of law, which the district court denied.

After three days of deliberation, the jury rendered a verdict, finding that Schlosser did not prove that VRH discriminated against her or retaliated against her, but that Schlosser did prove that VRH subjected her to a hostile work environment because of her sex or gender. Accordingly, the jury awarded Schlosser $58,170 in back pay.

Following the jury's verdict, VRH renewed its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), arguing that the evidence did not support the jury's verdict in favor of Schlosser on the hostile work environment claim. Ultimately, the district court denied VRH's motion, holding that, based on the totality of the evidence presented at trial, the jury could reasonably conclude that Schlosser was subjected to severe and pervasive harassment based on her gender while employed by VRH. After listing several examples of the evidence that supported this conclusion, the court summarized that Schlosser presented testimony that she "was subjected to unequal treatment as compared to her male counterparts, that she was verbally abused on multiple occasions which included statements suggesting an anti-female animus, and that this abuse continued during non-work hours due to the nature of her employment." Memo. Op., R. 96, Page ID #3874. In addition, the court held that there was also sufficient evidence presented at trial from which the jury could reasonably hold VRH liable for the harassing actions of Schlosser's supervisor and co-worker.

Following the district court's order, VRH timely appealed and argues that the district court erred in denying VRH's renewed motion for judgment as a matter of law.

## II. DISCUSSION

### A. Standard of Review

We review *de novo* the district court's denial of a renewed motion for judgment as a matter of law. *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016). "A court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting Fed. R. Civ. P. 50). In evaluating VRH's renewed motion, we "may not weigh the evidence, question the credibility of witnesses, or substitute our own judgment for that of the jury." *Smith*, 813 F.3d at 306 (citing *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015)). Instead, a renewed motion pursuant to Rule 50(b) may only be granted when, "viewing the evidence in a light most favorable to the non-moving party [and] giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Balsley v. LFP, Inc.*, 691 F.3d 747, 757 (6th Cir. 2012) (citation omitted). For VRH to succeed on its renewed motion, it "must overcome the substantial deference owed a jury verdict." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (citation omitted).

### B. Analysis

The jury in this case found that VRH subjected Schlosser to a hostile work environment, which occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). To prevail on a hostile work environment claim under Title VII, a plaintiff must show that: "(1) she was a member of a protected class; (2) she was subjected to unwelcome . . . harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). In this case, VRH does not dispute that Schlosser meets the first

two elements of a hostile work environment claim. However, VRH contends that the harassment was not based on Schlosser's sex, nor was the harassment "severe or pervasive." VRH further argues that there is no basis for employer liability because it took proper remedial action to protect Schlosser after she complained about the harassment.

### 1. Sexually Hostile Work Environment

Taking each of VRH's arguments in turn, we must first consider whether Schlosser proffered sufficient evidence from which the jury could conclude that she was subjected to a hostile work environment based on her sex or gender. Embedded within the hostile work environment analysis are two separate issues: (1) whether the harassment was based on Schlosser's sex or gender, rather than clashing personalities or other reasons not covered by Title VII's protections; and (2) whether the harassment was sufficiently severe or pervasive to alter Schlosser's working conditions, rather than isolated incidents or occasional teasing. We will consider each in turn.

At the outset, VRH argues that the district court "erred in considering: (a) the 'knot test'; (b) verbal counseling; (c) diving rotations; and (d) driving privileges as part of the totality of the circumstances that could constitute illegal harassment." Def.'s Br., ECF No. 14, 23. In other words, VRH contends that the district court should have considered solely the verbal abuse from Sanders and Brouse in determining whether a reasonable jury could find in favor of Schlosser on her hostile work environment claim. In support of this exclusion argument, VRH first claims that, as a matter of law, this Court cannot consider discrete acts of discrimination when evaluating whether the work environment was hostile. As a secondary argument, VRH contends that the jury's verdict precludes us from considering these facts in this case. VRH reasons that because the jury found that these actions did not adequately support Schlosser's discrimination claim, the jury necessarily held that these four acts were not related to sex or gender. Accordingly, VRH argues that it is "inconsistent and illogical" to also use these acts to support Schlosser's hostile work environment claim. *Id.* at 24. Both of these arguments are without merit.

First and importantly, Schlosser's evidence is not cleanly segregable into two neat buckets of evidence. For example, Sanders' ongoing verbal abuse toward Schlosser is further colored by his desire to continue keeping Schlosser out of the dive rotation. As explained further below, the court must review the "constellation of surrounding circumstances" and the totality of the environment that contributed to the alleged hostile working environment. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998). Actions that may not, on their own, constitute Title VII discrimination may nonetheless contribute to a jury's evaluation of the overall environment in which the plaintiff worked. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–15 (2002) (noting that an employee may use even untimely prior discrete acts of discrimination as "background evidence in support of a timely claim," and explaining that hostile environment claims "are based on the cumulative effect of individual acts"); *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 994 (6th Cir. 2009) (noting that discrete acts of discrimination, such as a failure to promote, cannot *alone* amount to a hostile work environment). Although discrete acts of discrimination are not independently actionable as a hostile work environment claim, the jury may certainly consider such acts in its evaluation of the overall working environment.[1]

Further, contrary to VRH's second argument, the jury's verdict on the discrimination claim is not necessarily inconsistent with its verdict on the hostile work environment claim such that evidence for the former should not be considered when evaluating the latter. This Court cannot divine the jury's thoughts as to why the disparate treatment claim did not succeed; there was no special verdict form in which the jury provided its findings on distinct factual issues in the case. While VRH incorrectly claims that the jury found that the above-listed actions "were not tied to gender," the jury in fact found only that Schlosser failed to show by a preponderance of the evidence that she experienced discrimination as defined by Title VII. This conclusion

---

[1]Even further, these actions are markedly different than a single "discrete act," such as wrongful termination or failure to hire. *Morgan*, 536 U.S. at 114. For example, the supervisors' decisions about which diving role Schlosser should fulfill on the team occurred daily. Likewise, the revocation of Schlosser's driving privileges affected her daily, as she had to ask a male to drive her to the bathroom whenever she needed to use it, causing major disruptions to her team's work. These everyday choices and occurrences are fairly characterized as "repeated conduct" that contributed towards the hostile work environment. *Id.* at 115; *cf. Cecil v. Louisville Water Co.*, 301 F. App'x 490, 499 (6th Cir. 2008) (evaluating employee's allegations regarding the "discriminatory assignment of work" as part of her hostile work environment claim).

could have little to do with the evidence for the hostile work environment claim, but could have instead been tied to one of the multiple, distinct elements of a discrimination claim. For example, the jury could have believed that Schlosser failed to prove that she was subjected to an adverse employment action, which is not similarly required for a successful hostile work environment claim. As an additional example, the jury may have found that Schlosser did not meet the high burden to prove constructive discharge. In short, there are a number of reasons why the jury could have rendered its discrimination verdict that do not undermine the evidence for the hostile work environment claim. The jury's decision to find VRH not liable on the discrimination claims did not prohibit the jury from considering the entirety of evidence presented at trial to evaluate the work environment, including the evidence that VRH challenges on appeal.

Accordingly, the district court and this Court may properly consider the "constellation of surrounding circumstances" in evaluating Schlosser's hostile work environment claim, which includes consideration of the four incidents listed above, any verbal or physical abuse that she experienced, and any other relevant evidence.

### i. Based on Sex or Gender

Schlosser must first demonstrate that a jury could reasonably find that the harassment she experienced was based on her sex or gender. Indeed, Title VII "does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion] . . . because of . . . sex." *Oncale*, 523 U.S. at 80. This type of actionable harassing conduct "need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id.*; *see also Williams*, 187 F.3d at 565 ("[H]arassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the 'based on sex' requirement."). Instead, a plaintiff may offer evidence of general hostility to a certain sex in the workplace, or comparative evidence about how the alleged harasser treated members of both sexes. *Oncale*, 523 U.S. at 80–81. "*Any* unequal treatment of an employee *that would not occur but for the employee's gender* may . . . constitute a hostile environment in violation of Title VII." *Williams*, 187 F.3d at 565 (emphasis in original).

In this case, the jury heard two types of evidence that may fairly be tied to Schlosser's gender. First, the jury heard testimony regarding repeated incidents that may have facially presented as sex-neutral, but circumstantial evidence would allow a reasonable jury to determine that the incident was gender related. *Cf. Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) (noting that "[f]acially neutral incidents may be included in a hostile-work-environment analysis of the totality of the circumstances when there is some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory." (citation omitted) (cleaned up)). For example, Schlosser was the only employee asked to perform a knot test, the only employee prohibited from diving multiple times, and the only employee prohibited from driving the company vehicle. If each event is considered in isolation, this treatment may seem unrelated to sex or gender; however, when viewed against the backdrop of Schlosser's status as the only female diver and the comparator evidence indicating that the male divers were never subjected to such treatment, the jury could reasonably tie these actions to Schlosser's gender. *See id.* (recognizing that the plaintiff's status as the sole woman assigned to her building was relevant to the determination that certain facially neutral incidents were based on sex); *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("[E]vidence that an employer has 'direct[ed] its discriminatory acts or practices at the protected group of which the plaintiff is a member' is probative of whether the employer has created a hostile work environment for the plaintiff-employee" (quoting *Jackson v. Quanex Corp.*, 191 F.3d 647, 661 (6th Cir. 1999))); *Smith*, 813 F.3d at 308–09 (finding harassment was tied to gender where plaintiff relied primarily on comparator evidence and presented evidence to the jury that "the harasser[s] treated men and women differently"). Further, at least one male diver opined that the decision to prohibit Schlosser from diving was "because [she] was a woman." Trial Tr. Vol. I, R. 89, Page ID #3192.

Second, the jury heard testimony regarding incidents that were more directly tied to Schlosser's gender. Namely, the verbal harassment from her supervisor, Sanders, as well as from her co-worker, Brouse, involved referring to Schlosser as a "bitch" or someone who was always "bitching." Such a term is indubitably sexually degrading and gender specific. *Cf. Passananti v. Cook County*, 689 F.3d 655, 666 (7th Cir. 2012) (collecting hostile work-environment cases involving "bitch" as a gender-specific insult and similarly holding that "[t]he

word is gender-specific, and it can reasonably be considered evidence of sexual harassment"); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 813 (11th Cir. 2010) (en banc) ("It is undeniable that the terms 'bitch' and 'whore' have gender-specific meanings."). And during the investigation into Sanders' harassment of Schlosser, the male dive members corroborated that Sanders did not treat the men in the same manner. Beyond the gender-specific insults employed by Sanders and Brouse, the verbal harassment was charged with anti-female animus in other ways, such as by challenging Schlosser's capacity to be a diver and questioning the legitimacy of her obtaining the job. *Cf. Lipsett v. Univ. of P.R.*, 864 F.2d 881, 905 (1st Cir. 1988) (finding that, although the verbal attacks from male supervisors and co-workers were not explicitly sexual, the challenging of the capabilities of the female plaintiff to be a surgeon was "nonetheless charged with anti-female animus" and "could be found to [contribute] to the hostile environment").

Overall, the multiple instances in which Schlosser was ostracized while her male counterparts were not, coupled with the gender-specific epithets used, provide sufficient evidence for a reasonable jury to find that the complained of harassment was based on Schlosser's gender or sex. Of course, the evidence could also support the conclusion that the harassment was tied to personal conflict, rather than gender; however, this Court may not reweigh the evidence to override the jury's reasonable determination. *See Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018) ("[T]he verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable." (quoting *J.C. Wyckoff & Assocs. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991))).

### ii. Severe or Pervasive

Schlosser must also show that a reasonable jury could find that the harassment that she experienced was sufficiently severe or pervasive to rise to the level of a hostile working environment. In determining whether Schlosser can meet this burden, both an objective and a subjective perspective must be considered. *See Harris*, 510 U.S. at 21; *Randolph*, 453 F.3d at 733 (holding that to succeed on her hostile work environment claim, "the conduct must be so severe or pervasive as to constitute a hostile or abusive working environment both to the reasonable person and the actual victim"). As part of this evaluation, this Court must consider

the "totality of the circumstances," rather than each event complained of in isolation. *Id.* (citing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). These circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. In other words, "we consider the 'work environment as a whole,' rather than individual instances of harassment." *Smith*, 813 F.3d at 310 (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)),

Importantly, this Court views whether harassment was severe or pervasive as "quintessentially a question of fact." *Id.* (quoting *Jordan*, 464 F.3d at 597). As such, the jury is in the best position to evaluate the credibility of the witnesses and evidence presented at trial, which involved weighing competing stories against one another. After all, "[c]ommon sense[] and an appropriate sensitivity to social context" enable juries to distinguish between simple teasing and conduct that a reasonable person in the plaintiff's position would find severely hostile. *Oncale*, 523 U.S. at 82. Accordingly, particularly on this fact-intensive question, a substantial degree of deference is owed to the jury's verdict. *See Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).

Based on the evidence presented at trial, the jury could reasonably review the totality of the circumstances and determine that Schlosser was subjected to severe or pervasive harassment based on her gender. *Cf. Willams*, 187 F.3d at 564 ("[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII threshold."). On appeal, VRH ignores these requirements and separately attacks each incident of sexual hostility, rather than recognizing the collective import of the incidents over the course of a short ten-week period, which robs the incidents of their cumulative effect. But viewing the evidence in the aggregate, as this Court must, the jury could reasonably determine that VRH frequently ostracized Schlosser by making her perform tests while the men were not similarly questioned about their abilities, as well as by singling her out as the lone employee prohibited from both diving and from driving the company vehicle. *Cf. Waldo*, 726 F.3d at 820 (finding that a jury could have reasonably

believed that the plaintiff demonstrated a hostile work environment where a female employee's male co-workers ostracized and isolated her).

In addition, the jury heard evidence that Schlosser's immediate supervisor verbally harassed her on a daily basis for several weeks, including by stating multiple times that she was not a "real diver." *See, e.g.*, Trial Tr. Vol. I, R. 89, Page ID #3155. Sanders' daily harassment, coupled with his clear desire to remove Schlosser from his team, complaining that she "bitched about everything," directly affected the day-to-day conditions of Schlosser's work environment. Even after Schlosser moved teams—albeit at Sanders' request—she continued to weather harsh verbal assaults by a co-worker, which often included being called "a bitch." During one of these incidents, Brouse even tried to physically push Schlosser. Additionally, throughout her time at VRH, Schlosser was consistently fielding threats that she would be fired and insults that she was not qualified to perform her job. Not only did Brouse punctuate his verbal assault by stating, "they [will] fire you before they fire me," but Schlosser testified that this type of threat was common from her co-workers and her superiors. *Id.* at Page ID #3176, 3189.

Viewed in the light most favorable to Schlosser, not a day of her ten weeks at VRH passed without some type of sexual harassment or ostracization. Accordingly, the totality of the circumstances could reasonably indicate that Schlosser suffered pervasive harassment that altered her job environment, conditions, and performance. Even though VRH cites several cases from this Court to support the proposition that the harassment Schlosser endured was not "severe or pervasive" enough to subject VRH to liability, these cited cases function to illustrate exactly how fact-intensive and credibility-orientated this prong of the hostile work environment inquiry is. Context matters for the jury's evaluation of the severeness or pervasiveness of alleged harassment. *Cf. Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (finding no hostile work environment where employee presented one instance of a supervisor's "relatively contentious oral confrontation"); *Goller v. Ohio Dep't of Rehab. & Corr.*, 285 F. App'x 250, 259 (6th Cir. 2008) (finding no hostile work environment where plaintiff's supervisor frequently called her "Barbie" and never physically threatened plaintiff); *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 351 (6th Cir. 2005) (finding harassment not pervasive enough to constitute a hostile work environment where employee alleged three isolated incidents over a period of two

and a half years). The distinguishable facts of these cases do not preclude a reasonable jury from finding for Schlosser on her hostile work environment claim, where the verbal abuse she endured could be reasonably viewed as significantly more aggressive, pervasive, and continuous.

The jury fairly concluded that Schlosser did not endure "simple teasing" or "isolated incidents." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998). Instead, as the lone female diver, Schlosser faced daily threats to her employment, derogatory comments, verbal harassment, foul language, and constant changes to her pay and position "to which members of the opposite sex were not exposed." *Randolph*, 453 F.3d at 734. And this harassment occurred daily throughout a compressed period of ten weeks. For these reasons, a reasonable juror could find that a hostile work environment existed. *Cf. Austion v. City of Clarksville*, 244 F. App'x 639, 652 (6th Cir. 2007) (admitting that the hostile work environment evidence was "meager," but holding that "we are not persuaded that a reasonable juror could not find that a hostile work environment existed, especially when the evidence is viewed in the light most favorable to [the plaintiff]").

## 2. Employer Liability

Turning to VRH's second argument, VRH next challenges the fifth and final element of Schlosser's hostile work environment claim, which involves a showing of a basis for employer liability. This analysis differs depending upon whether the harasser is classified as a co-worker or as a supervisor who is capable of taking tangible employment actions. *See Wyatt v. Nissan N. Am.*, 999 F.3d 400, 412 (6th Cir. 2021). With regard to the two complained-of harassers, based on the parties' agreement as to their employment status, we analyze in turn the claims against Sanders using the supervisor framework and the claims against Brouse under the co-worker framework.

### i. Supervisor Sanders

When evaluating harassment engaged in by a "supervisor," employers may be held to a higher expectation and face potential strict liability, rather than mere negligence. *Id.* Specifically, an employer will be found to be "vicariously liable 'when a supervisor takes a tangible employment action,' . . . —*i.e.*, 'a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance v. Ball State Univ.*, 570 U.S. 421, 429 (2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998); *Faragher*, 524 U.S. at 807–08). After all, the supervisor would not be able to take such an action absent the agency relation. But even if the supervisor's harassment does not culminate in a tangible employment action, "the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense." *Id.* This affirmative defense, often referred to as the "*Faragher/Ellerth* affirmative defense," requires a showing: (1) that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

Using this framework, Sanders could take "tangible employment actions" with respect to Schlosser, such as altering her pay by consistently placing her in the tender position. The jury reviewed evidence indicating that Sanders, as one of the two dive team supervisors, had significant input on the divers' performance evaluations. *Cf. Ellerth*, 524 U.S. at 762 (explaining that a tangible employment action "may be subject to review by higher level supervisors"); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (noting that the supervisor did not fire the plaintiff; rather, the Career Path Committee did, but the employer was still liable because the committee functioned as the supervisor's "cat's-paw"). Because the diving supervisors' input and discretion empowered them to assign their subordinates to different job duties, of which the tender job paid significantly less, such action carried significant economic consequences. *Cf. Vance*, 570 U.S. at 437 n.8 (explaining that an individual would have supervisory status if he had input on evaluations that carried economic consequences). Sanders' actions are therefore evaluated under the supervisor framework. Having established that Sanders *could* take tangible employment actions, this Court must next determine whether Sanders' harassment *did* culminate in a tangible employment action, or alternatively, whether VRH can evade liability through the *Faragher/Ellerth* affirmative defense.

Construing the facts in favor of Schlosser, the jury could reasonably determine that Sanders' harassment culminated in a tangible employment action.  Schlosser was explicitly prohibited from diving on two separate occasions:  (1) after her first dive in late May 2016 for approximately one week, and (2) in late July 2016 until Schlosser's resignation.  After the first prohibition from diving, Schlosser was cleared to dive again approximately one week later.  However, prior to submitting her formal complaint regarding Sanders' harassment, Sanders only permitted Schlosser to dive one time for 45 minutes over a two-week period.  (Notably, this 45-minute dive occurred based on Adler's recommendation to Sanders; when Sanders made unilateral decisions in selecting divers, he refused to allow Schlosser to dive.)  In contrast, the male divers on Schlosser's team received hundreds of minutes in the water.  Schlosser dove on a consistent basis only after being moved to Bigos' dive team.

Specifically regarding the second prohibition from diving, on July 24, 2016, Madden emailed Bigos and Sanders, instructing them to place only their "most productive" divers in the water.  The email stated, "we need to evaluate who is superior," and "we should be reshuffling the teams to achieve the best possible combination."  Pl.'s App'x, ECF No. 22, 42.  Although the message also singled Schlosser out and stated that she should not be diving "for at least the next two weeks," the jury heard testimony that the diving supervisors retained discretion over which divers could be considered "productive."  Trial Tr. Vol. IV, R. 92, Page ID #3728.  Despite Schlosser being removed from Sanders' team and the evidence that Schlosser's diving had improved, Sanders still replied to Madden's email, stating that Schlosser was "indisputabl[y]" the least talented.  Pl.'s App'x, ECF No. 22, 84.  Madden replied, "Bam.  Perfect!  This is what I needed to hear/see."  *Id.*

Based on this evidence, a jury could conclude that the sexual harassment from Sanders resulted in a tangible employment action—keeping Schlosser from diving, which caused her to receive significantly lower pay.  Accordingly, a jury could reasonably find VRH strictly liable for Sanders' harassment.

*ii. Co-worker Brouse*

Throughout trial, the jury heard testimony related to three separate incidents with Schlosser's co-worker, Aaron Brouse.  And even though Schlosser highlighted these three particularly egregious encounters, the jury also heard testimony that Brouse harassed Schlosser daily, outside of these specifically described incidents.  To find VRH liable for Brouse's actions, the jury had to find that VRH was "negligent in controlling working conditions."  *Vance*, 570 U.S. at 424.  In other words, VRH may be liable for co-worker harassment "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action."  *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021) (citation omitted).

VRH attempts to skirt liability for Brouse's actions by arguing that Schlosser refused to report the harassment or provide a written statement regarding the second incident in which Brouse screamed profanities at Schlosser, including calling Schlosser a "slimy bitch."  This may be true, but it is not dispositive for the employer-notice inquiry, which asks whether VRH *knew* about the harassment.  *Randolph*, 453 F.3d at 735 (finding summary judgment for employer was improperly granted where plaintiff's testimony indicated that supervisors were aware of harassment but largely ignored it); *Jackson*, 191 F.3d at 663 (explaining that, to hold an employer vicariously liable for a co-worker's harassment, an employee need not "report" the harassment; instead, the relevant inquiry is whether the employer knew of the offenses).  VRH fails to provide any argument to counter the fact that Schlosser's supervisor, Bigos, was present for all three incidents and declined to take any action to stop the harassment, much less bring the harassment to the attention of Human Resources.  Indeed, Bigos did not even become involved during the second incident—Brouse actually complained about Schlosser to the site manager.  Throughout each described incident of sexual harassment, Bigos knew of the charged sexual harassment but failed to take any corrective action at all.  *Cf. Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) ("Evidence a supervisor knew of the harassing conduct suffices to establish constructive notice.").

Based on the evidence presented at trial, Bigos heard Brouse berating Schlosser on multiple occasions, calling her a "bitch," and being aggressive towards her.  Yet Bigos never reprimanded Brouse or took any action to correct this pattern of behavior.  *Cf. Clark*, 400 F.3d at

350 (finding employer could not benefit from affirmative defense at the summary judgment stage where "there [was] a real question as to whether the supervisor[] should have taken the first step towards prevention and correction by reporting [the observed] incidents to the relevant . . . personnel").  A reasonable jury could find that Bigos knew of the harassment and made no attempt to correct the problem of the sexually harassing behavior, thus establishing the required negligence on VRH's part.  Because VRH does not dispute that Bigos may properly be considered a supervisor, this inaction may be reasonably imputed to VRH.

### III.  CONCLUSION

In this case, the jury heard four days of testimony and evidence and subsequently deliberated over the course of three additional days.  VRH has not "overcome the substantial deference owed" to the jury's verdict.  *Braun*, 828 F.3d at 510.  Viewing the evidence in the light most favorable to Schlosser, a jury could reasonably find that the severe or pervasive harassment was based on sex or gender, and that VRH should be held liable for its employees' actions.  For the reasons set forth above, we **AFFIRM** the district court's denial of VRH's renewed motion for judgment as a matter of law on Schlosser's hostile work environment claim, thus allowing the jury verdict to stand.