NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0060n.06

Case No. 25-1408

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| DENA LEATH, | ) | FILED<br>Jan 28, 2026<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellant, | ) |  |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE EASTERN |
| DOUGLAS A. COLLINS, Secretary of the United States Department of Veterans Affairs, | ) | DISTRICT OF MICHIGAN |
|  | ) |  |
| Defendant-Appellee. | ) | O P I N I O N |
|  | ) |  |

Before: DAVIS, RITZ, and HERMANDORFER, Circuit Judges.

DAVIS, Circuit Judge. Dena Leath sued the Department of Veterans Affairs ("VA") after she resigned from her criminal investigator post. Throughout her approximately three-year tenure, she and a handful of coworkers often disagreed and reported each other's behavior to superior officers. Three factfinding investigations found persistent tension and division in Leath's department that fell short of actionable harassment. After Leath left, she brought hostile-work-environment, race and gender discrimination, and constructive discharge claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). The district court granted the VA summary judgment on all of Leath's claims. Leath timely appealed. We AFFIRM.

**I.**

**A. Factual Background**

Dena Leath joined the VA Police Services as a criminal investigator at its Ann Arbor, Michigan Medical Center in July 2018. Leath, a Black woman, is a veteran with more than two decades of experience in law enforcement. By some accounts, she did her job well. But she butted heads with a handful of coworkers—namely, Lieutenant James Victorian, a Black man, and Officers Shane Haynes and Robert Ettinger, white men.

From the start, some of Leath's colleagues opposed her hire. That is because Leath was an "external hire," meaning that she had never worked for the VA before. (Williams Factfinding, R. 20-4, PageID 294). Haynes and Ettinger thought that an internal candidate should have gotten the job. They voiced these sentiments at Leath's first all-staff meeting in September or October 2018. This incident made Leath cry. After that, she noted an atmosphere of hostility based on her gender: male officers' "demeanor," "eye rolls," "budd[ying] up" with other men, and "conversation . . . shift[s]" when she entered a room. (Leath Dep., R. 20-2, PageID 233–34).

Leath and Victorian clashed early on. In October 2018, Leath, Victorian, and another VA employee attended an out-of-state training. Leath and Victorian recall the ensuing incident differently. Leath said that she called out Victorian for fixing a salad at a salad bar without paying for extra add-ons, and he responded that she was being "petty." (*Id.* at 239). Victorian said he grabbed dressing thinking it was complimentary, Leath did not confront him at the salad bar, and that he learned about Leath's allegation through the office grapevine.

Next was the mailbox incident. In January 2019, Captain Matthew Hester asked Leath to grab something from his in-office mailbox. Victorian was sitting in front of the mailbox. According to Leath, she politely asked him to move, and he said that she did not need to be mean

to him. "[C]oncerned that [Victorian] would try to make an issue," Leath reported the interaction. (Leath Report, R. 20-7, PageID 348). According to Victorian, Leath yelled at him to get out of her way. Calmly, he asked her to lower her voice and speak in a professional manner. But Leath continued yelling and slammed a chair against a desk in anger. Victorian was "bewildered" by Leath's "confrontational attitude," so he reported her behavior. (Victorian Report, R. 12-2, PageID 128). Haynes also witnessed the altercation and submitted a report. According to him, the confrontation was one-sided, and Leath acted unprofessionally.

Victorian and Leath continued squabbling. In April 2019, Leath told Victorian that the pages of a warrant he drafted were out of order. He screamed at her, yelling that never in his law enforcement career had a warrant he wrote been denied. Leath did not recall whether she reported the interaction to anyone. On another occasion, Victorian—pondering his haircut—said that he did not want his hair to grow out and "be nappy." (Leath Dep., R. 20-2, PageID 242). Leath perceived this comment as a slight on her natural hair.

Around September 2019, Haynes, in an email to Hester, accused Leath of fraudulently reporting her time. A subsequent investigation revealed that Haynes's allegation was unfounded.

Leath shared all of these concerns with Zenia Berry, an Equal Employment Opportunity (EEO) Specialist from the Detroit VA location, in November 2019. The VA engaged Berry to conduct a factfinding inquiry[1] into multiple Ann Arbor VA employees' hostile-work-environment and harassment allegations. She interviewed twenty-nine employees, including Leath. As part of the investigation, Ettinger told Berry that Leath violated evidence retention protocol sometime around October 2018 by storing evidence in her purse and desk drawer. Ettinger was mistaken

---

[1] Berry's investigation was not an official EEO investigation. The VA engaged Berry because she was a neutral third party. Another VA administrator later clarified with Leath that Berry did not investigate allegations in response to an official EEO complaint.

about the purse. Leath had, however, locked evidence in her desk drawer instead of putting it in the evidence locker. She was not disciplined.

Berry's investigation confirmed "tension and division" that fell short of actionable harassment. (Berry Report, R. 20-12, PageID 358). As relevant to Leath's allegations, "most witnesses" found the staff meeting comments "unprofessional," but they believed the comments were directed at Chief Gregory Allen, not Leath. (*Id.* at 357).

Leath's complaints continued. In January 2020, she received a courtesy violation notice for parking illegally in the VA lot. The notice—tantamount to a warning—did not impose a fine. Leath suspected that Haynes, who issued the notice, intentionally singled out her car because the cars adjacent to hers did not receive notices.

A few months later, Haynes neglected to use Leath's title when referencing her in an incident report. He referred to the two other male officers in the report by their rank. Haynes's behavior was part of a pattern; several other officers sometimes addressed colleagues without using their titles. Leath complained about Haynes. Allen put a stop to this in a June 2020 email directing staff to use official titles when referring to their colleagues.

There was another mailbox-related incident in early July 2020. This time, Victorian put two Criminal Investigator books in Leath's office mailbox. Leath was offended because the books were ten years old. She emailed Allen and Deputy Chief James Myers, suggesting that the actions constituted a criminal offense. Allen asked Myers to look into it. Myers spoke to Victorian, who claimed that he just thought Leath might want the books. As a result, both Victorian and Leath received non-disciplinary counseling statements.

A few weeks later, precipitated by Haynes giving her "intimidating stares," Leath complained about his repeated hostile behavior toward her. (Leath Report, R. 20-20, PageID 413).

And she suggested that Victorian and Haynes had "a problem with [her] being a female . . . and also . . . an African American." (*Id.*).

That complaint spurred a second factfinding investigation. Lead Chief of Police William A. Robinson and Deputy Chief of Police LaCario Johnson assessed Leath's harassment and hostile-work-environment allegations. Their August 2020 report issued factual findings on each of the incidents detailed above. The report concluded that the "external hire" comments, accessing-the-mailbox incident, overtime fraud allegation, and "intimidating stares" allegations were "not substantiated." (Robinson-Johnson Mem., R. 20-4, PageID 294–99). The parking warning and book-in-mailbox situations were factually substantiated. But neither amounted to harassment or creating a hostile work environment. Like Berry's report, this investigation concluded that there was "tension and division" among the VA's police officers. (*Id.* at 300).

Leath reported the most recent incidents involving Victorian and Haynes through the VA's Disruptive Behavior Reporting System on August 28, 2020. She said that they had "constantly said or done things to belittle and demean me, because I am a female," "I came in from the outside," and they "ha[ve] a problem with me being a female in this position, and also as an African American." (Disruptive Behavior Report, R. 20-21, PageID 415).

In September 2020, three officers reported Leath for acting unprofessionally. Leath told a new officer, Keith Wilhoite, that he should have read a suspect *Miranda* warnings before asking him questions. Victorian, Wilhoite's supervisor, clarified that per the VA manual, only suspects interrogated in custody must be Mirandized. And Officer Sean Barrett chimed in, adding that it depends on the facts and circumstances of the interrogation. According to Victorian and Barrett, Leath became confrontational and accused them of acting unethically. Because Wilhoite reported to Victorian, Victorian felt that Leath's actions were disrespectful toward the chain of command.

Barrett corroborated Victorian's account, describing Leath as "condescending" and "unprofessional." (Barrett Report, R. 12-2, PageID 138). Wilhoite recalled feeling unsettled, especially because Leath's admonishment contradicted VA policy. Leath remembered the whole interaction differently. She was concerned that the new officer had violated a suspect's constitutional rights. And she viewed the fact that three officers reported her as evidence of targeted harassment. Leath took a two-week-long leave of absence at the end of September 2020, citing "physical and emotional symptoms consistent with significant vocational stress." (Leath Email, R. 12-2, PageID 142).

Brandon Tasker, Operations Captain of the Toledo, Ohio VA, conducted a third factfinding investigation. To him, "the situation with Leath and Victorian" appeared beyond repair. (Tasker Report, R. 20-28, PageID 433). He recommended that they avoid each other. And he concluded that "management has taken all of the appropriate steps" to address officers' concerns. (*Id.*). At the end of the day, this appeared to be "a petulant personal conflict," not an actionable workplace complaint. (*Id.*).

One more incident occurred before Leath resigned. During a live television broadcast of the January 6, 2021, breach of the U.S. Capitol building, Leath says that Haynes told her: "this is the way a rally is supposed to go." (Leath Dep., R. 20-2, PageID 237). Haynes does not remember that interaction. A few months later, on May 23, 2021, Leath resigned.

### B. Procedural History

Before filing this lawsuit, Leath exhausted her administrative remedies by filing an EEO complaint containing hostile-work-environment and harassment claims. *See* 42 U.S.C. § 2000e-

16(c).  Then, in June 2023, Leath sued the Secretary of Veterans Affairs.[2]  She amended her complaint twice.  The operative complaint contained two counts: "Title VII Violation[s]" and "Constructive Discharge" "under Title VII" based on race and gender discrimination.  (Second Am. Compl., R. 12, PageID 116–17).  The parties conducted discovery.  Then the VA moved for summary judgment.

The district court "generously construe[d]" Leath's Title VII count as "asserting claims for retaliation, hostile work environment, and race and gender discrimination." *Leath v. Sec'y of United States Dep't of Veterans Affs.*, No. 2:23-CV-11407, 2025 WL 968896, at *5 (E.D. Mich. Mar. 31, 2025).  It found that Leath's hostile-work-environment and discrimination claims failed as a matter of law. *Id.* at *6–12.  The court also rejected Leath's attempt to bring a standalone constructive discharge claim, considering constructive discharge instead as a function of Leath's discrimination allegations. *Id.* at *6, 11–12.  And to the extent that Leath alleged a separate retaliation claim, that failed either because she did not exhaust it or because Leath abandoned any retaliation claim by leaving the defendant's arguments unaddressed.[3] *Id.* at *12.  Accordingly, the district court granted the government's summary judgment motion in full. *Id.*

## II.

We review the district court's grant of summary judgment de novo. *Smith v. P.A.M. Transp., Inc.*, 154 F.4th 375, 382 (6th Cir. 2025) (citation omitted).  "[I]f the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," then summary judgment is proper.  Fed. R. Civ. P. 56(a).  "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat

---

[2] Federal Rule of Civil Procedure 25(d) automatically substitutes current Secretary Doug A. Collins for his predecessor, Denis R. McDonough, who held the position when this action was filed.

[3] Leath does not challenge the district court's construction or dismissal of any potential retaliation claim on appeal.

summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009). Either "the evidence presents a sufficient disagreement to require submission to a jury," or "it is so one-sided that one party must prevail as a matter of law.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)).

## A. Title VII – Hostile Work Environment

Leath argues that the district court erred by evaluating her factual allegations separately, rather than considering their cumulative effect, when analyzing her hostile-work-environment claim. We perceive no such error. And we agree that the government is entitled to summary judgment on this claim.

Title VII prevents employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie hostile-work-environment claim under Title VII, a plaintiff must show:

 (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [membership in a protected group], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (citation omitted).

This appeal only implicates the third, fourth, and fifth factors. Because each factor is necessary, Leath's claim fails if she cannot "establish[] any one of [those] three requirements." *Eng. v. Gen. Dynamics Info. Tech. Co.*, 536 F. App'x 537, 539 (6th Cir. 2013) (analyzing only one of three relevant factors). Leath has not established facts on which a reasonable jury could conclude that her treatment was based on her race or sex, in satisfaction of the third factor. This failing alone forecloses her ability to make out a prima facie case. Nonetheless, because her

primary contention on appeal challenges the district court's analysis of the severe-or-pervasive factor, we briefly address each of the disputed factors for the sake of completeness.

###### 1. Treatment Based on Membership in Protected Group

Harassment is "based on" a protected category when "it would not have occurred but for the plaintiff's" belonging to a protected group. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011). A plaintiff can rely on direct or comparative evidence to show that she experienced harassment based on a protected characteristic. *See Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021) (race); *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 685–86 (6th Cir. 2024) (gender). Direct evidence of racial animus includes "the use of race-specific and derogatory terms." *Williams*, 643 F.3d at 511. Comparative evidence encompasses "how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* To show gender-based animus, "a plaintiff may offer evidence of general hostility" toward women in the workplace, "or comparative evidence about how the alleged harasser treated" men and women. *Schlosser*, 113 F.4th at 685.

Much of the behavior Leath highlights on appeal lacks any articulable connection to her race or gender. Indeed, she readily admitted that her coworkers' hostility could be motivated by her outsider status. And three factfinding investigations concluded that Leath's allegations amounted to interpersonal conflicts wholly unrelated to any discriminatory animus. The district court found that, for the most part, Leath did not identify record evidence showing that "race or gender factored into what happened." *Leath*, 2025 WL 968896, at *7. We agree.

Other portions of the record relate to gender, but Leath has not shown that she was allegedly harassed *because of* her gender. For instance, it is undisputed that Haynes once neglected to use Leath's title but referred to her male peers by their rank. However, this fact alone does not defeat summary judgment. "Title VII does not prohibit all . . . harassment in the workplace; it is directed

only at discrimination because of sex." *Schlosser*, 113 F.4th at 685 (citation modified). Although Leath has pointed to a single instance of Haynes treating her differently from men, she has not identified circumstantial evidence or established any basis to infer that her gender was the but-for cause of Haynes's behavior. In fact, she testified that Haynes never said anything negative to her about race or gender. The same is true for her atmospheric observations about officers "snickering," her feeling "isolated" and "ostracized," and male officers excluding her socially and professionally. (Leath Con't Dep., R. 20-19, PageID 389; Leath Dep., R. 20-2, PageID 233–35). Leath may believe that gender motivated this behavior. But unless she identifies "specific facts supporting this general testimony," her conclusory allegations cannot withstand summary judgment. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citation omitted).

Leath also underscores "coded hostility" in the "purse" and "nappy" comments. (ECF 17, Appellant's Br., 10). Under different circumstances, pejorative references to a female employee's purse or talking about a Black employee's hair in this way could be discriminatory. *See Strickland*, 995 F.3d at 504 (a facially benign word like "boy" can assume obvious racial connotations even when used without "modifiers or qualifications" (additional citation omitted)). Not in this case. Ettinger's "purse" comment accurately described where he thought Leath was improperly storing evidence. And Leath conceded that Victorian—who is also Black—was talking about his *own* hair when saying that he did not "want [it] to grow and be nappy." (Leath Dep., R. 20-2, PageID 242). Properly contextualized, this was a descriptive statement about his grooming preferences. Though Leath—who wears her hair naturally—took offense, disagreement about the import of this aside does not create a genuine issue that would require submission to a jury. *See Anderson*, 477 U.S. at 249. So in sum, we agree with the district court that Leath has not established a factual dispute on the issue of whether she was harassed based on a characteristic protected by Title VII.

2. Severe or Pervasive

Even had Leath linked the harassment she alleged to a protected characteristic, it would not qualify as "severe or pervasive" enough to "alter the conditions of employment and create an abusive working environment." *Waldo*, 726 F.3d at 813 (citation omitted); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). During her approximately three-year-long tenure at the VA, Leath alleged about fourteen different incidents. We consider this to be relatively infrequent. *Compare Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707–08 (6th Cir. 2007) ("fifteen specific incidents spanning a two-year period" were "not pervasive" enough to satisfy this prong) *with Schlosser*, 113 F.4th at 687–88 (daily harassment for ten weeks is sufficiently frequent) *and Johnson v. Ford Motor Co.*, 13 F.4th 493, 505–06 (6th Cir. 2021) ("constant" "daily" harassment over four-month period is frequent). As to severity, Leath has produced evidence that resembles "simple teasing" and "[m]ere disrespect or antipathy" indicative of interpersonal conflict rather than identity-based hostility. *Johnson*, 13 F.4th at 505 (citation omitted); *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 484 (6th Cir. 2020). The record evidence does not reflect behavior that resembles that which we have found to be severe. *E.g., Johnson*, 13 F.4th at 506 (coworker's "specific demands to see or receive pictures of [plaintiff's] breasts or vagina, infused with references to [her] race" constituted severe harassment).

Leath has not convinced us that the district court "disaggregated" her claims, thereby "robb[ing] the incidents of their cumulative effect." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 561 (6th Cir. 1999). The court scrutinized relevant authority and correctly noted that we have found more egregious behavior to fall short of Title VII's "relatively high bar." *Leath*, 2025 WL 968896, at *8 (canvassing authority). Analogizing to our caselaw is a proper way for the district court to delineate what constitutes "severe." *See Clay*, 501 F.3d at 707–08. We see no error in

the court's analysis, and we agree with its conclusion that Leath did not experience severe or pervasive harassment actionable under Title VII.

### 3. Employer Knowledge

Finally, to hold the VA liable for coworker-led harassment, Leath would need to show that its "response to [her] complaints manifested indifference or unreasonableness in light of the facts the employer knew or should have known." *Waldo*, 726 F.3d at 814 (citation modified). Quick, decisive action—especially an employer's decision to promptly investigate the factual basis of an employee's complaint—usually suffices. *See Doe v. City of Detroit, Michigan*, 3 F.4th 294, 301–02 (6th Cir. 2021) (collecting authority). Here, the VA engaged two independent investigators to examine Leath's complaints. The second investigation concluded that management had "taken all of the appropriate steps" to address officers' concerns. (Tasker Report, R. 20-28, PageID 433). Multiple internal investigations occurred, too. None supported Leath's hostile-work-environment allegations. Investigations aside, the VA acted affirmatively to resolve Leath's specific complaints. Allen emailed staff directing them to use all employees' official rank. He also responded swiftly to Leath's complaint about the books in her mailbox. Like the district court, we consider these responses reasonably calculated to address Leath's concerns. *See Waldo*, 726 F.3d at 814. In sum, Leath has not presented evidence to establish a prima facie hostile-work-environment claim.

### B. Title VII – Discrimination

Leath argues that the district court ignored material facts when granting the government's summary judgment motion on her "claim of constructive discharge." (ECF 17, Appellant's Br., 12–13). The district court considered her constructive-discharge allegations as an adverse

employment action, concluding that she could not establish a prima facie discrimination case. *Leath*, 2025 WL 968896, at *6, 10–12. We agree with that conclusion.

When a plaintiff provides only circumstantial evidence to support her workplace-discrimination claim, we apply the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). First, the plaintiff must establish a prima facie case, which creates a presumption that discrimination occurred. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–54 (1981). Second, the burden shifts to the defendant to rebut that presumption with a "legitimate, nondiscriminatory reason" for its actions. *Id.* at 254. Third, the burden reverts to the plaintiff to show "that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

A prima facie case requires four fundamental showings. A plaintiff must have been (1) "a member of a protected group," (2) "subject to an adverse employment decision," (3) "qualified for the position," and (4) "replaced by a person outside of the protected class." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021). Constructive discharge can satisfy the "adverse employment action" prong. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). That means the plaintiff must have resigned in the face of discrimination intolerable "to the point where a reasonable person in his position would have felt compelled to resign." *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citation omitted).[4]

---

[4] Whether Leath must also show that the VA "deliberately created intolerable working conditions as perceived by a reasonable person . . . with the intention of forcing [her] to quit," *Logan,* 259 F.3d at 568–69 (citation modified), raises an important question that is not at issue in this appeal. "[T]he subjective intent requirement still used by this Circuit" "arguably conflicts" with *Green. Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 816 (6th Cir. 2020); *contrast Green*, 578 U.S. at 560 ("We do not also require an employee to come forward with proof . . . that his quitting was his employer's plan all along."). The government asked for the pre-*Green* subjective-intent requirement during the district court proceedings, but it has not renewed its request on appeal. And Leath takes no position on the issue.

Leath points to limited record evidence supporting her arguments on appeal. All the evidence that she identifies—the parking notice, exclusion from investigations, and a false accusation of timekeeping—is accounted for in the district court's order. But none of these examples are supported by citations "to particular parts of materials in the record" to show that they comprised intolerable discrimination. Fed. R. Civ. P. 56(c)(1)(A).

Leath asks us to infer that her coworkers' "hostility was aimed at forcing her departure." (ECF 17, Appellant's Br., 13). But she is only entitled to the benefit of "reasonable inferences." *Waldo*, 726 F.3d at 818 (citation omitted). An inference that is unsupported by record evidence is not reasonable. *See Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). Because Leath did not identify supporting record evidence, we cannot infer that her coworkers' conduct compelled Leath to resign or that she otherwise faced intolerable discrimination.

Leath identifies no other theory to support a finding of adverse action. So her failure to demonstrate that she was constructively discharged means that she cannot make out a prima facie case for discrimination. We, therefore, agree that the government is entitled to summary judgment on this claim.

On a related note, Leath argued below that constructive discharge is an independent cause of action. The district court rejected her attempt to fashion a freestanding constructive discharge claim, relying mostly on in-circuit, district-court precedent. *Leath*, 2025 WL 968896, at *6. However, it also found that "because Leath's hostile work environment claim fails as a matter of law . . . her constructive discharge claim does too." *Id.* at *11. In support, it cited *McDaniel v. Wilkie*, which implicitly authorized a constructive discharge cause of action. *Id. See* No. 19-3304, 2020 WL 1066007, at *4 (6th Cir. Jan. 31, 2020) ("To the extent that [plaintiff's] constructive-

discharge claim relied on the VA having a hostile work environment, because there is no genuine dispute that she failed to establish the latter claim, the same holds for the former.").

On appeal, Leath does not challenge (or mention) the district court's conclusion. Her brief appears to assume that constructive discharge is a freestanding claim. Because she has not identified any potential legal error in the district court's opinion or otherwise developed an argument explaining the contours of such a claim and how she has met them, she has forfeited this issue for appeal. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) ("[W]here issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." (citation modified)). And we consider it no further.

**IV.**

For the reasons discussed above, we **AFFIRM**.