NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0126n.06

No. 24-5249

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 05, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| JASON JONES, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| FLUOR FACILITY & PLANT SERVICES, | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellee. | ) | |
| | ) | OPINION |
| | ) | |

Before: CLAY, WHITE, and DAVIS, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Jason Jones appeals the district court's grant of summary judgment to Defendant, Fluor Facility & Plant Services, on his claims of a hostile work environment based on racial discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a), and the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. §§ 344.040(1)(a) and 344.280(1). For the reasons set forth below, we **REVERSE** the district court's grant of summary judgment to Fluor on all of Jones' claims and **REMAND** this matter to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Factual History

Plaintiff Jason Jones is an African American man. Defendant Fluor Facility and Plant Services hired Jones as a maintenance worker in May 2020. Fluor is an industrial maintenance contractor. As part of Fluor's maintenance team, Jones performed labor and industrial maintenance for Fluor's customer, Logan Aluminum, an aluminum manufacturer located in Logan

County, Kentucky. Fluor maintained an onsite office at Logan Aluminum, where Jones and other employees worked. Jones remained at the company until his suspension in March 2022 and eventual termination, which was after, but unrelated to, his filing of the complaint in this litigation.

### 1. Racial Harassment

Throughout his employment with Fluor, Jones' white coworkers allegedly racially harassed and ostracized him. Jones asserts that his coworkers' conduct amounted to racial harassment. His allegations focus on the events that occurred while Jones worked on the night shift, as he did for the bulk of his time at Fluor. We note, however, that Jones was also allegedly racially harassed by a white coworker when he worked the day shift, as he did "early on" in his employment on the maintenance team. Pl.'s Dep., R. 38-2, Page ID #266.[1] Jones was transferred to the night shift following this incident, though the reason for his transfer is unclear. Evidence of all the instances of racial harassment and workplace ostracization discussed were before the district court on summary judgment via the parties' submissions, particularly Jones' Response in Opposition to Fluor's Motion for Summary Judgment, Jones' deposition, the deposition of Mark Thornberry, and the exhibits attached to the depositions.

Jones started on the night shift in September or October 2020. About five or six people worked the night shift at that time, and throughout Jones' time at Fluor. Jones' immediate

---

[1] In this incident, a white coworker of Jones', Caleb Harper, occupied Jones' chair, and did not give Jones his chair back when first asked. Jones got another chair, prompting Harper to ask Jones if he wanted the chair back. Jones said no, and Harper replied "[y]ou don't want the chair back because I'm white." Pl.'s Dep., R. 38-2, Page ID #268. Later, Harper "hover[ed]" behind Jones as he was working. *Id.* at Page ID #268. Jones asked Harper to move, and Harper said to a crowd of employees that Jones "didn't want [Harper] sitting behind [him] because [he] would catch the Corona[virus]." *Id.* Jones reported Harper's behavior to a superior, Casey Craig, without using Harper's name. However, Craig fired Harper when he revealed himself to be the cause of Jones' complaint.

supervisor was Mark Thornberry, the night shift supervisor, and Thornberry's supervisor was Casey Craig, who had hired Jones.

Jones was the only African American on the night shift during his tenure at Fluor. Indeed, for most of his time at the company, he was the only African American working at Fluor's operation at Logan Aluminum. *See* Thornberry Dep., R. 40-1, Page ID #681 (Thornberry testifying that there was "one other" African American on the day shift during Jones' tenure who "didn't last long"). From the time Jones started on the night shift, his white coworkers made comments about the "color of his skin" so frequently that Thornberry felt compelled to start taking notes on what was said in November 2020. *Id.* at #685.

Several instances of verbal racial harassment occurred in the first nine days of November 2020. In one incident, a white employee, Alex Walpole, referred to Jones as "nigger" in front of two other coworkers. Pl.'s Dep., R. 38-2, Page ID #272; Pl.'s Dep. Ex.1, R. 38-2, Page ID #332.[2] That same week, another white employee, Tim Bowersock[3], repeatedly goaded Jones to make racist jokes about white people "in front of the entire staff." Pl.'s Dep. Ex. 1, R. 38-2, Page ID #332. Jones and Thornberry documented that this goading took place on November 2 and 3, 2020. They also testified that Bowersock's harassing behavior started before November. Bowersock previously attempted to get Jones to tell racist jokes, and Bowersock previously made jokes about Black people. Bowersock expressed to Thornberry that he "thought it should be okay to tell racial jokes." Thornberry Dep., R. 40-1, Page ID #691.

---

[2] Months later, in a witness statement submitted to Fluor, Jones described Walpole's use of the slur as a "term of endearment." *Id.* at Page ID #332. We note that, contrary to Fluor's argument, in context, "term of endearment" refers to Jones' description of how Walpole perceived the slur, but not how Jones himself perceived the slur. *See infra* pages 19–20.

[3] There are alternate spellings of Bowersock's name in the record, but we use Bowersock because it is the spelling used by Fluor Human Resources personnel.

By November 9, 2020, Thornberry "had enough" of the night crew racially harassing Jones, and called a meeting during which he asked the crew to stop their harassment. *Id.* at Page ID #686. Everyone on the crew at the time attended the meeting, including Jones. During the meeting, "it was brought up that everyone knew that [Jones] was called the N word." Pl.'s Dep., R. 38-2, Page ID #274. In response, one white employee, Joe Fleming, said that the crew "should be able" to call Jones the slur because "this is construction," and the slur was "a natural term that we use around here." *Id.* at Page ID #274. Fleming used the word "nigger" twice during the November 9 meeting, in reference to his contention that the use of the slur was appropriate. Jones asked Fleming not to use the slur after the first utterance, but he said it again. Nevertheless, Thornberry testified that at the meeting the crew members agreed to stop harassing Jones.

But after the November 9 meeting, Jones faced additional harassment from his white coworkers. On November 10, 2020, the day after the meeting, Bowersock "threw a wad of grease" on Jones' car windshield. Pl.'s Dep. Ex. 1, R. 38-2, Page ID #334. Jones witnessed Bowersock sling the substance onto his windshield: It was a rainy night, and Jones was sitting in his car to warm it up. Bowersock denied throwing grease on Jones' car, but Thornberry corroborated that Jones showed him a substance that "looked like grease" that he wiped off his windshield. Thornberry Dep., R. 40-1, Page ID #692. The incident prompted Thornberry to report Bowersock's harassment of Jones to Craig, his supervisor. Craig had a talk with Bowersock on November 12, and told Bowersock to "stop it." *Id.* at Page ID #693. But Bowersock's harassment did not stop. Bowersock made another racial comment to Jones on November 19, 2020, while Bowersock was overseeing the night crew. While the crew was working, a white crew member, Kyle Johnson, got oil on his arm, prompting Bowersock, to ask Jones if Johnson was his "boy,"

4

meaning son or brother. Pl.'s Dep. Ex. 1, R. 38-2, Page ID #333. Jones was "visibly upset" by the comment. *Id.*

Jones was also ostracized by his white coworkers throughout his tenure at Fluor. The night shift employees avoided communicating with Jones about daily tasks, turned their backs or left when he entered the breakroom, and denied him rides in the shared buggies employees drove around the worksite even when the buggies were not at capacity. This behavior started "shortly after" Jones transferred to the night shift crew in Fall 2020 and was ongoing when he filed a statement with Fluor in late March 2021. Pl.'s Dep., R. 38-2, Page ID #275. Bowersock and Fleming led efforts to avoid or exclude Jones, and other crew members adopted ostracizing behavior towards Jones while in their presence.

In addition, Jones testified that at unspecified times throughout his employment, "I was told I was a rapper because I was black. . . . I was told I played basketball because I was black. . . . [T]here[] [was] a lot of stereotyping going on." *Id.* at Page ID #324. Jones testified that, when introduced to new coworkers at Fluor, they made comments like "I bet you're good at basketball" at least thirty times during his tenure. *Id.* at Page ID #325. He indicated similar interactions about him being a rapper, identifying one specific coworker, Matt Moore, who told Jones he was a rapper. Jones identified these comments as discriminatory, because they were made "based on [his] color:" He was told he was a rapper not "because [he] gave concerts at work," but because of stereotypes about Black people being rappers. *Id.* at Page ID #326–27. Jones also heard from Thornberry that his coworkers referred to him as "boy." *Id.* at Page ID #324.

### 2. Fluor's Investigation of Racial Harassment

On March 31, 2021, Fluor's Human Resources Department initiated an investigation into Jones' coworkers' treatment of him. The investigation came about after Jones was reported for a

safety violation. Sometime in March, Jones did not wear a required safety harness while performing work at a high altitude. Jones testified that he could not access a harness because his harness had seemingly disappeared, and his coworkers refused to let him borrow theirs. An unknown coworker complained about the safety violation, garnering Jones a verbal counseling with a Fluor supervisor, Art Riley. Jones' interactions with Riley resulted in Jones and Thornberry filing written witness statements with Fluor on March 30, 2021. In their statements, both described the use of racial epithets on the night shift crew in November 2020, Bowersock's contemporaneous harassment of Jones, the crew's ostracization of Jones, and other conflicts.

Dawn Gallegos, the Fluor Human Resources coordinator, investigated Jones' and Thornberry's allegations of racism on the night shift crew. She spoke repeatedly with Jones, who told her that after the November 9, 2020, meeting with Thornberry, his coworkers had stopped making racial comments to his face, but he was unaware of what went on behind his back.

Gallegos also spoke with Bowersock, Fleming, and other workers on the night crew, who either failed to discuss or denied Jones' allegations of racism. After investigating, Gallegos concluded that the crew "jok[ed] around with Jason [Jones]" but that "these jokes and horseplay" were not of a racial nature, "other than during the two weeks [in] early November." Pl.'s Dep. Ex. 11, R. 38-2, Page ID #435. She found that "[n]o racially-related comments or behavior . . . occurred after November 9 when Mark [Thornberry] held a crew meeting." *Id.*

Fluor took no immediate remedial steps after Gallegos' investigation. In the Spring of 2021, there was a lack of direction among Fluor's management as to what next steps to take, if any, in response to Jones' complaints of racial harassment. In April 2021, Jones' notes reflect that the resolution of Gallegos' human resources investigation had been left to Craig, who indicated in a conversation with Jones that "Dawn [Gallegos] ha[d] left it up to him to finish on his own time,"

6

that he was putting together a speech on expectations and requirements for the night crew, and, according to Jones, that Craig was "confused on what the right move [wa]s because it may be too harsh." Pl.'s Dep. Ex. 23, R. 38-2, Page ID #558. Thornberry's work journal corroborates that Craig intended to have a meeting to "end[] all th[e] drama" on the night shift, Thornberry Dep. Ex. 2, R. 40-2, Page ID #726, but there is no evidence in the record that this meeting occurred.

However, Gallegos indicated to Jones that it was untrue that Craig was "under no timetable," and told him "[t]hat she knew what she was doing," contradicting Craig's purported uncertainty about next steps. Pl.'s Dep., R. 38-2, Page ID #295. She turned Jones over to Stephanie Baker, who was part of Fluor's Ethics Committee, to put a "second set of eyes" on the investigation. Pl.'s Dep., R. 38-2, Page ID #295–96. Baker called Jones in May or June 2021, telling him that she was "confused" that he was displeased with Gallegos' "concluded" investigation and "unsatisfied with the outcome." Pl.'s Dep. Ex. 23, R. 38-2, Page ID #564. Jones told Baker he did not know of the investigation's outcome, asking "[h]ow can I be dissatisfied with the investigation if I still thought it was ongoing?" *Id.* Baker and Jones scheduled another call to discuss the investigation, but Jones testified that they never again spoke.

In August 2021, Jones filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The charge referenced Jones' March 30, 2021 statement about the use of the n-word and retaliation for that statement, noting that the outcome of the Fluor investigation was unknown. The EEOC subsequently issued a right-to-sue letter.

### B. Procedural History

Jones filed his federal complaint against Fluor on November 15, 2021, seeking damages. He asserted the following claims: (1) race discrimination/racially hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a)(1); (2) race

7

discrimination/racially hostile work environment under the Kentucky Civil Rights Act ("KCRA"), Ky. Rev. Stat. § 344.040(1)(a); (3) retaliation for complaining about an illegally hostile work environment under Title VII, 42 U.S.C. § 2000e-3(a); and (4) retaliation for complaining about an illegally hostile work environment under the KCRA, Ky. Rev. Stat. § 344.280(1).

Fluor moved for summary judgment on all claims. It argued for summary judgment on the following grounds: (1) Jones could not proceed on his hostile work environment claim because he cannot establish that he suffered severe or pervasive racial harassment; (2) even if Jones suffered severe or pervasive harassment, Fluor cannot be held liable for racial harassment because Jones failed to complain to Fluor management about his coworkers' racially discriminatory conduct, and when he did write a statement, human resources took immediate remedial action by investigating; and (3) Jones could not proceed on his retaliation claims because Fluor never took adverse action against Jones due to his race or complaints he made about discrimination.

Jones responded, contending that summary judgment should be denied, in part, because (1) "it is clear that [he] was subjected to discrimination that was both objectively and subjectively severe and pervasive to create a hostile work environment," Pl.'s Resp. in Opp. to Mot. for Summ. J., R. 40, Page ID #658; (2) Fluor "knew or should have known about the continued hostile work environment based on race and failed to take remedial action" given Thornberry's, Craig's, and Riley's knowledge of his coworkers' harassing conduct and the lack of discipline his coworkers faced, *id.* at Page ID #658–59; and (3) his coworkers' harassment was retaliation for his engagement in activities protected under Title VII and the KCRA, constituting adverse action sufficient to support his retaliation claims.

The district court granted summary judgment for Fluor on all Jones' claims. As to the hostile work environment claims, the court concluded that Jones had failed to establish a necessary

element of his prima facie case, that any racial harassment he suffered was sufficiently severe or pervasive to alter his conditions of employment and create an abusive working environment. The court did not reach the parties' arguments as to Fluor's liability for the alleged harassment. Regarding Jones' retaliation claims, the court concluded that Jones' evidence of his coworkers' allegedly retaliatory conduct was not severe enough to constitute adverse employment action, and that Jones was unable to impute liability for his coworkers' conduct to Fluor. The court dismissed Jones' complaint with prejudice.

Jones' timely appeal followed.

## II. DISCUSSION

### A. Standard of Review

"We review a district court's grant of summary judgment de novo." *Johnson v. Ford Motor Co.*, 13 F.4th 493, 502 (6th Cir. 2021) (internal quotation marks omitted). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389–90 (6th Cir. 2008). "If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a 'genuine issue' for trial via 'specific facts.'" *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

We must view the evidence in the light most favorable to the party opposing the motion for summary judgment. *Strickland v. City of Detroit*, 995 F.3d 495, 503 (6th Cir. 2021). "This includes drawing 'all justifiable inferences' in the nonmoving party's favor." *George*, 966 F.3d at 458 (quoting *Anderson*, 477 U.S. at 255). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016) (quoting *Anderson*, 477 U.S. at 249).

## B. Analysis

### 1. Jones' Racially Hostile Work Environment Claims

As explained, the district court granted summary judgment to Fluor on Jones' racially hostile work environment claims, concluding that Jones failed to provide evidence that he suffered racial harassment sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment. Jones argues that the district court erred because "there is evidence from which a factfinder could reasonably conclude" that he was subjected to severe or pervasive harassment based on his race, sufficient to preclude summary judgment on his hostile work environment claims. Appellant's Br., ECF No. 13, 14–25.

Title VII § 2000e-2(a)(1) makes actionable the claim that a work environment is infected with "discriminatory conduct . . . so severe or pervasive that it create[s] a work environment abusive to employees because of their race." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993). "Because [the KCRA] mirrors Title VII[,] . . . we use the federal standards for evaluating" hostile work environment claims based on race discrimination under both statutes. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir. 2000).

The elements of a racially hostile work environment claim are as follows:

> (1) the plaintiff belonged to a protected group, (2) the plaintiff was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Johnson*, 13 F.4th at 503 (internal quotation marks omitted).

Nominally, Fluor challenges only the fourth element, whether Jones was subjected to racial harassment that was sufficiently severe or pervasive. But it also argues that Jones identified only one instance of racial harassment: Walpole's usage of the n-word. And the district court's conclusion that the harassment Jones put into evidence was not sufficiently severe or pervasive was based, in part, on its conclusion that Jones did not supply "evidence showing that his coworkers' conduct, other than the use of racial epithets and the incident where Bowerso[ck] poured grease on his windshield, was related to his race." Op. & Order, R. 42, Page ID #753. Therefore, both the third element, whether the harassment was based on race, and the fourth element, whether the harassment was severe or pervasive, are in dispute in this case. We first discuss whether the harassment Jones suffered was based on race.

### a. *Based on Race*

Jones must first demonstrate a genuine dispute of material fact as to whether the harassment he experienced was based on his race. Indeed, Title VII "does not prohibit all verbal or physical harassment in the workplace; it is directed only at *discrimination*" that occurs because of an employee's membership in a protected group, in this case, Jones' race. *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 80 (1998) (internal quotation marks omitted) (alteration adopted) (discussing Title VII's prohibition against discrimination in the context of sex).

The district court concluded that Jones evidenced "a few incidents of racist language and joking," prior to Thornberry's November 9 anti-harassment meeting, including "three uses of the N-word, only one of which was actually directed towards him as a 'term of endearment.'" Op. & Order, R. 42, Page ID #750.[4]  It also identified Bowersock's comment about Johnson being Jones' boy as "arguably racial." *Id.* at 751.  And it inferred that the "incident where Bowerso[ck] poured grease on Jones' windshield," though "not explicitly racial in nature," was "race based" because of "Jones' other allegations related to Bowerso[ck]." *Id.*  But the district court discounted other facially neutral conduct, like Jones' "assertions that his coworkers ignored or isolated him," because there was "insufficient information to support a reasonable inference that [the conduct] was based on Jones' race." *Id.* (internal quotation marks omitted).

The district court erred in this conclusion.  We conclude that Jones has established, at the very least, a factual dispute as to whether this seemingly neutral conduct was race-related.  We have said that "[c]onduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, []he would not have been the object of harassment." *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

In *Schlosser v. VRHabilis, LLC*, 113 F.4th 674 (6th Cir. 2024), we considered a similar pattern of harassment, albeit one based on sex.  The plaintiff presented evidence of two types of harassment, each of which was "fairly . . . tied" to her gender. *Id.* at 685–86.  First, she presented

---

[4] Fluor argues that Jones' assertion that the "N-word was used three times . . . towards him or in his presence," and that the district court found this fact, is a new argument or evidence. Appellee's Br., ECF No. 15, 18, 23 n.3 (internal quotation marks omitted).  This is incorrect:  As explained in the text, the district court did find this fact.  Fluor also argues that Jones, for the first time on appeal, "now claims that multiple instances were race related where he made no such claims before the District Court." *Id.* at 23 n.3.  This argument is also meritless, as Jones consistently argued in the district court that his coworkers' conduct was based on racial animosity.

"repeated incidents that may have facially presented as sex-neutral, but circumstantial evidence would allow a reasonable jury to determine that the incident was gender related." *Id.* at 686. The "facially neutral" evidence the plaintiff relied on included the fact that the plaintiff, as the only female diver on her diving crew, was singled out repeatedly as "the only employee asked to perform a knot test, the only employee prohibited from diving multiple times, and the only employee prohibited from driving the company vehicle." *Id.* Second, she presented evidence of "verbal harassment" that was gender-specific and charged with "anti-female animus." *Id.* We held that "the multiple instances in which Schlosser was ostracized while her male counterparts were not, coupled with the gender-specific epithets used, provide sufficient evidence for a reasonable jury to find that the complained of harassment was based on Schlosser's gender or sex." *Id.* at 686–87.

As in *Schlosser*, Jones presents evidence of two categories of incidents fairly tied to his race. The first set of incidents are verbal harassment directly linked to Jones' race, the second set of incidents may facially present as race-neutral, but a factfinder could nevertheless infer that they were race-based. *See id.*; *Clay*, 501 F.3d at 706.

As to the first category, Jones established three uses of the n-word by his coworkers: One direct usage, when Walpole referred to Jones as a "nigger," and two indirect usages, when Fleming used the term during the November 9 meeting to argue that it should be okay to continue to refer to Jones that way. The n-word is indubitably racist, "highly offensive and demeaning," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004), whether used directly or indirectly, or, indeed, as a "term of endearment." *See id.* at 1116–17; *Johnson v. United Parcel Serv.*, 117 F. App'x 444, 454 (6th Cir. 2004) ("Case law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'").

As the district court acknowledged, Jones also submitted evidence that Bowersock goaded him to make racist jokes, and Bowersock told racist jokes himself. Whether Jones' evidence of the "content or frequency" of these occurrences was insufficient, or whether they were "mere offensive utterances," as the district court concluded, Op. & Order, R. 42, Page ID #750 (internal quotation marks omitted), goes to whether the harassment Jones faced was severe or pervasive, but not to whether the harassment was race-based. A factfinder could readily conclude that "but for" Jones' race, he would not have been the subject of Bowersock's goading. *See Clay*, 501 F.3d at 706. The same is true for Bowersock's comment that another white coworker, Johnson, was Jones' "boy" after Johnson spilled oil on himself. Jones fairly understood this comment to be racial in nature, as it allows the inference that Bowersock was implying a familial relationship between Johnson and Jones after Johnson's skin was presumably rendered black because of the oil.

As to incidents that may present as facially neutral, but from which a factfinder could nevertheless infer racial animus, we first consider the incident in which Bowersock threw grease on Jones' windshield. The district court described this incident as susceptible to the inference that it was "race based" because of "Jones' other allegations related to Bowerso[ck]." Op. & Order, R #42, Page ID #751. We agree. As discussed, Bowersock racially harassed Jones prior to the grease incident by goading him to make racist jokes or making racist jokes himself. And he continued to racially harass Jones after the grease incident, in part by making the Johnson comment. We have stated that "facially neutral abusive conduct can support a finding of animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly discriminatory conduct." *Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) (cleaned

up); *see also Clay*, 501 F.3d at 706–07. Bowersock's race-based comments thus give rise to the inference that the grease-throwing was also racially motivated. *See Schlosser*, 113 F.4th at 686.

For the same reasons, we can attribute racial motivation to the night crew's ostracization of Jones. There were "multiple instances in which [Jones] was ostracized" as the only African American on the night crew. *See id.* As Thornberry testified, efforts to exclude Jones were led by Bowersock and Fleming, who had previously made racist comments or used racial epithets. Further, the ostracization coincided with racist verbal harassment. This provides sufficient evidence for a reasonable factfinder to conclude that Jones' complained-of ostracization was based on race. *See id.*; *Jordan*, 464 F.3d at 596–97 ( (considering "racial insults, isolation and segregation" to support proof of discriminatory animus); *Clay*, 501 F.3d at 707 (considering the plaintiff's status as the "only black employee in her work area," and the only employee to receive discipline for certain conduct, to support an "inference, sufficient to survive summary judgment, that race was the motivating reason" behind her supervisor's behavior).

A rational factfinder could also find that other incidents cited by Jones that may lack explicit racial animus may nevertheless constitute racial harassment under Title VII. For one, Jones presented evidence that his white coworkers referred to him as "boy." We have said that although not explicitly racial, a white colleague "referring to an adult African American colleague as 'boy,' without 'modifiers or qualifications' can qualify as evidence of impermissible racial bias." *Strickland*, 995 F.3d at 504 (quoting *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006)). We need not discount Jones' evidence that his coworkers called him "boy" because he heard it secondhand from Thornberry, because "[i]t is well-established that incidents of racial harassment that a plaintiff learns of secondhand and did not personally experience may 'contribute to a work environment that was hostile.'" *Id.* (quoting *Jackson v. Quanex Corp.* (*Jackson-Quanex*), 191 F.3d 647, 661

(6th Cir. 1999). Likewise, white coworkers' comments referencing Jones being a rapper or a basketball player may not be explicitly racial out of context. But these comments undoubtedly reflected African American stereotypes such that a rational factfinder could find that they would not have been made but for Jones' race, as Jones recognized. *See* Pl.'s Dep., R. 38-2, Page ID #326–27 (Jones testifying that he was told he "was a rapper . . . because I was Black, and they were stereotyping me"). Therefore, the comments may be "properly considered in a hostile-work-environment analysis." *Clay*, 501 F.3d at 706.

Overall, Jones has "created an inference, sufficient to survive summary judgment, that race was the motivating reason" behind his coworkers' harassment and ostracization. *See id.* at 707. The district court erred in concluding otherwise.

### b. *Severe or Pervasive*

Jones must also show a genuine dispute of material fact as to whether the racial harassment he experienced was severe or pervasive, precluding summary judgment on his hostile work environment claims. In determining whether racial harassment is sufficiently severe or pervasive to create a hostile work environment, this Court judges "the conduct in question . . . by both an objective and a subjective standard." *Johnson*, 13 F.4th at 505 (internal quotation marks omitted). "This means that the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Id.* (alteration adopted) (internal quotation marks omitted). Concluding that a work environment was hostile or abusive does not require the conclusion that it "seriously affected plaintiff's psychological well-being or led her to suffer injury." *Harris*, 510 U.S. at 22 (alteration adopted) (internal quotation marks omitted). "As part of this evaluation, this Court must consider the 'totality of the circumstances,' rather than each event complained of in

isolation." *Schlosser*, 113 F.4th at 687 (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). Though not "a mathematically precise test," relevant considerations in the totality of the circumstances inquiry include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Harris*, 510 U.S. at 22–23. Generally, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted). However, harassing acts and comments of a "continual" nature can constitute pervasive harassment and evidence of an objectively hostile work environment. *Johnson*, 13 F.4th at 505 (internal quotation marks omitted). And, "[i]mportantly, this Court views whether harassment was severe or pervasive as 'quintessentially a question of fact'" best reserved for a jury. *Schlosser*, 113 F.4th at 687 (quoting *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016)).

In the present case, the district court erred in granting summary judgment to Fluor on the severe or pervasive prong of Jones' claims because there is sufficient evidence in the record that he subjectively regarded his work environment as abusive, and that his coworkers' racial harassment was severe or pervasive enough for a reasonable person to find his work environment hostile. The district court did not separately evaluate the subjective and objective prongs of the severe or pervasive test and appeared to proceed solely on the objective prong. Nevertheless, Fluor argues that Jones did not subjectively perceive a hostile work environment because he stated that Walpole's use of the n-word was a "term of endearment," and he only complained of racial harassment in March 2021, "'saving' his complaint" for when he faced discipline for failing to use

17

his harness. Appellee's Br., ECF No. 15, 25–27. We reject Fluor's arguments inasmuch as Jones has provided sufficient evidence that he subjectively regarded his work environment as hostile.

As an initial matter, "the intent of the alleged harasser is irrelevant in the court's subjective prong analysis." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999). That Jones perceived that Walpole meant his use of the n-word as a term of endearment does not mean that Jones perceived the slur to be inoffensive. And Walpole's intent "is not a defense under the subjective test if the conduct was unwelcome." *Id.* Jones provided sufficient evidence that he regarded Walpole's use of the n-word to be offensive and unwelcome. Jones characterized Walpole's use of the slur as a "term of endearment" because Walpole "said it to [him] as if we say it to each other all the time," as though the two were friends. Pl.'s Dep., R. 38-2, Page ID #272. But he clarified that he was not excusing Walpole's utterance of the slur as harmless. *Id.* Jones further described the possibility of Walpole calling him the n-word again as a "problem" that was solved when Walpole was moved to another work location and was "no longer in [his] face every day." *Id.* at Page ID #273.

Jones also made clear that he perceived his coworkers' use of racial epithets to be offensive, and he perceived their conduct to be abusive. *See, e.g.*, Pl.'s Dep., R. 38-2, Page ID #283 (testifying that he objected to Fleming's use of the n-word during the November 9, 2020 meeting); #326–28 (testifying that being referred to as a rapper or basketball player was discriminatory and implying it was humiliating); Pl.'s Dep. Ex. 1, R. 38-2, Page ID #333 (recounting that he was "visibly upset" when Bowersock referred to Johnson as Jones' "boy"). Indeed, by March 2022, Jones felt so abused by his coworkers that he expressed suicidal and homicidal ideation because of stress at work. (Pl.'s Dep., R. 38-2, Page ID #303–04).

"In addition, the subjective component of the prima facie case does not require that a plaintiff report a hostile work environment." *Williams*, 187 F.3d at 566. So, contrary to Fluor's argument, Jones' failure to report racial harassment to Fluor human resources before March 2021 does not cut against our conclusion that he provided sufficient evidence that he perceived his work environment as abusive. "A plaintiff can be subjected to [racial] harassment sufficiently severe or pervasive as to constitute a hostile environment and yet, for a number of valid reasons, not report the harassment." *Id.* at 566. For example, Jones testified that he did not immediately report Walpole's statement because he was afraid his coworkers would retaliate if he reported. He also questioned whether it would be "right" to report the incident, given that it would affect Walpole's career when Walpole was new to the workforce and, from Jones' perspective, possibly unaware of the "mistake" he made in using the n-word. Pl.'s Dep., R. 38-2, Page ID #272. Nevertheless, the record shows that Jones did report racial harassment multiple times before March 2021, albeit not directly to Fluor human resources. Jones reported the incident with Harper, on the day shift, to Craig, presumably resulting in Harper's firing. Jones also participated in the Thornberry's November 9, 2020 meeting addressing the instances of harassment against Jones in November 2020. And, after Bowersock threw grease on his car, Jones immediately showed Thornberry evidence of Bowersock's conduct. So, rather than "'sav[e]' his complaint of harassment for the proverbial 'rainy day,'" Appellee's Br., ECF No. 15, 26, the record contains evidence that Jones brought his coworkers' continual racial harassment to his superiors' attention. At present, Jones has provided evidence, sufficient to preclude summary judgment, that he subjectively regarded his work environment as abusive.

Addressing the objective prong, Jones has also established sufficient evidence that his coworkers' racial harassment was severe or pervasive enough for a reasonable person to find his

work environment hostile, precluding summary judgment for Fluor. We came to a similar conclusion in *Schlosser*, holding that "a reasonable juror could find that a hostile work environment existed" in Schlosser's case where, "throughout a compressed period of ten weeks" she was subjected to verbal abuse and ostracization based on her gender. 113 F.4th at 688–89. This harassment "directly affected the day-to-day conditions of Schlosser's work environment." *Id.* at 688. She was ostracized when she was singled among her male counterparts for discipline and prohibited from diving or driving a company vehicle for a period. *Id.* at 679–80. Some of Schlosser's issues temporarily resolved after she switched dive teams—she was allowed to resume diving for a few weeks—but she faced continual verbal abuse from a coworker on her new team. *Id.* at 681, 688. This coworker "tried to physically push" her, and verbally threatened her with firing, a threat typical for Schlosser's time at VRH, where "Schlosser was consistently fielding threats that she would be fired and insults that she was not qualified to perform her job." *Id.* at 688. We concluded that the "totality of the circumstances could reasonably indicate that Schlosser suffered pervasive harassment that altered her job environment, conditions, and performance." *Id.*

The same is true in Jones' case. Viewing Jones' evidence in the light most favorable to him, Jones experienced a weeks-long period of verbal hostility, as did Schlosser. *See id.* The verbal hostility "directly affected the day-to-day conditions of [Jones'] work environment," *id.*, so much so that his supervisor, Thornberry, "had enough" of the harassment and held a meeting to stop it. Thornberry Dep., R. 40-1, Page ID #686–87. The verbal harassment did not stop after the meeting but continued. And, as in *Schlosser*, the verbal hostility escalated into a physical threat when Bowersock threw grease on Jones' windshield. *Cf.* 113 F.4th at 688. In addition, Jones' coworkers ostracized him for months, subjected him to stereotyping, and called him "boy." This is clearly enough evidence of severe or pervasive harassment for Jones to submit his racially hostile

20

work environment claim to a jury. Contrary to the district court's conclusion, Jones does not allege instances of "offensive utterances and social avoidance . . . alone," Op. & Order, R. 42, Page ID #753. Rather, he presents evidence of persistent racial harassment that took various forms, from overt verbal harassment, to physical conduct, to persistent stereotyping, to ostracization.

The district court came to its erroneous conclusion because it failed to consider all of Jones' evidence of racial harassment, and failed to consider Jones' evidence holistically. It erroneously discounted Jones' evidence, other than "the use of racial epithets and the incident where Bowersox poured grease on his windshield," *id.*, for two reasons. First, it concluded that Jones' evidence paralleled that in *Reed v. Procter & Gamble Manufacturing Co.*, in which we found that a plaintiff's allegations of an isolated racist gesture and racist remarks did not amount to severe or pervasive harassment when the plaintiff failed to tie his other allegations of harassment, including that he was the "subject of unfriendly treatment from some colleagues," to his race. 556 F. App'x 421, 433 (6th Cir. 2014); *see also* Op. & Order, R. 42, Page ID #752. Second, it concluded that "the majority of Jones' claims [we]re simply too vague to support the notion that his coworkers' conduct was sufficiently severe or pervasive." Op. & Order, R. 42, Page ID #752.

But Jones' evidence of ostracization, as well as his evidence that he was subjected to pervasive racial comments, stereotyping, and called "boy," are fairly considered as contributing to the totality of severe or pervasive racial harassment. The cases on which Fluor and the district court rely for the proposition that Jones' complained-of workplace exclusion did not contribute to a pattern of severe or pervasive racial harassment, particularly *Reed*, are distinguishable. In *Reed*, which we note was unpublished and therefore not binding, we discounted the plaintiff's evidence that he was excluded from lunches with his colleagues because the "record [was] devoid of evidence" that he was subjected to this treatment because he was African American. *Reed*, 556 F.

App'x at 433. As explained above, the same is not true in this case, because we can impute racial animus to the ostracization Jones faced from his coworkers. Therefore, the evidence of ostracization is properly considered when determining severity or pervasiveness. *See Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011). And though Reed's alleged ostracization was social, Jones alleged that his coworkers' avoidance impacted work tasks. Because "unreasonbl[e] interfere[nce] with an employee's work performance" is an indication that racial harassment is more severe, *Harris*, 510 U.S. at 23, Jones' evidence of ostracization comfortably supports the determination that Jones has established enough evidence to raise a genuine dispute of material fact as to whether he suffered severe or pervasive racial harassment. The district court erred in removing this evidence of ostracization from its "totality of the circumstances" calculus based on *Reed*.

The district court also erred in removing many of Jones' allegations of harassment from the severe or pervasive calculus on the grounds that the evidence was too vague. The court characterized Jones' evidence of ostracization, stereotyping, and being called "boy" as insufficiently specific to contribute to the totality of the circumstances of severe or pervasive racial harassment. But we have "noted that when a victim makes allegations of ongoing harassment, the 'inability to recount any more specific instances goes to the weight of her testimony, a matter for the finder of facts.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 334 (6th Cir. 2008) (quoting *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998)). In *Abeita*, we reversed the district court's conclusion that Abeita's evidence of sexual harassment was not sufficiently severe or pervasive to constitute an objectively hostile work environment because the court failed to consider Abeita's contention that she was subjected to harassing comments that "were commonplace, ongoing, and continual." 159 F.3d at 252. Though Abeita alleged few specific

22

"sexual and gendered statements," and "[o]nly one of the statements" had her as its subject, we held that her assertion of continual harassment was "sufficient evidence of a hostile environment to submit her claim to the fact finder." *Id.*

In this case, as in *Abeita*, Jones alleges continuing or commonplace harassment with sufficient detail for us to consider the harassment as evidence of a hostile work environment. Though Jones alleges few instances where his coworkers made explicitly racial comments, Thornberry testified that racial comments, in general, were made very frequently in the Fall of 2020. Jones also provided specific examples of ostracization, describing his coworkers' refusal to give him buggy rides, and alleged that this was an issue not just "during COVID," but throughout "the entire process" of his issues at Fluor. Pl.'s Dep., R. 38-2, Page ID #275. In addition, Jones testified that his coworkers continually stereotyped him, and that "[a]t least 30" times, coworkers made comments like "I bet you're good at basketball," asked if he played basketball upon first meeting him, or said that he was a rapper. *Id.* at Page ID #324–25. And he testified that his coworkers used the racist, derogatory form of reference "boy" "a lot" to refer to him, though he heard this secondhand. *Id.* at Page ID #324. Contrary to the district court's conclusion, we can fairly consider all this evidence in determining that Jones has alleged sufficiently severe or pervasive harassment to preclude summary judgment for Fluor, leaving the jury to weight Jones' inability to recount certain instances of harassment with more specificity. *See Abeita*, 159 F.3d at 252.

Based on the above, a reasonable person could find Jones' work environment at Fluor to be hostile and abusive based on his coworkers' severe and pervasive racial harassment, and the district court erred in concluding otherwise.

### c. *Fluor's Knowledge of Racial Harassment*

On appeal, Fluor contends that, notwithstanding the severity or pervasiveness of the racial harassment Jones faced, we can affirm the district court's grant of summary judgment because Jones cannot establish that Fluor knew, or should have known, about the harassment but failed to act. The parties briefed this employer liability issue on summary judgment, but the district court declined to reach it. Therefore, the appropriate course of action is for the district court to determine in the first instance whether there is a genuine dispute of material fact regarding whether Fluor knew or should have known about the race-based harassment and failed to act in response. *See Johnson*, 13 F.4th at 507.

### 2. Jones' Retaliation Claims

In addition to Jones' hostile work environment claims, he asserts that he presented sufficient evidence from which a reasonable jury could find that Fluor retaliated against him in violation of Title VII and the KCRA, and that Fluor is liable for his night crew coworkers' retaliation against him under Title VII and the KCRA.

Title VII provides that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). The KCRA, Ky. Rev. Stat. § 344.280, contains an analogous provision; again, we evaluate both of retaliation claims under the federal standards. *See Smith*, 220 F.3d at 758. We need not address Jones' claim that Fluor retaliated against him, because we conclude that

24

Jones has provided sufficient evidence of coworker retaliation to preclude summary judgment for Fluor.

Ordinarily, to establish a prima facie case of retaliation under Title VII, a plaintiff must show that his employer "took an adverse employment action against [him]" in response to activity protected under Title VII. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009). But we recognized in *Hawkins v. Anheuser-Busch* "that Title VII protects against coworker retaliatory harassment that is known to but not restrained by the employer," and set out a test for determining when coworker conduct constitutes retaliation actionable under Title VII. 517 F.3d at 345, 347. When a plaintiff alleges coworker retaliation, instead of assessing whether his employer took an adverse employment action against him, we assess whether an employer is liable for a coworkers' retaliatory actions. In *Hawkins*, we said that employer liability will attach for a coworker's actions if:

> (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Id.* at 347. As with the traditional Title VII retaliation inquiry, the coworker's retaliatory conduct needs to be causally linked to activity protected under Title VII. *See Perkins v. Harvey*, 368 F. App'x 640, 647–48 (6th Cir. 2010); *cf. Hawkins*, 517 F.3d at 347 (considering employer liability for coworker retaliation after concluding that "there [wa]s no question" that plaintiffs engaged in protected activity, and that they alleged that their coworker's conduct was retaliation for the protected activity).

Fluor disputes Jones' ability to establish employer liability for coworker retaliation and argues that Jones' allegations of coworker harassment cannot constitute retaliation because they did not occur in response to protected activity. We first discuss Jones' engagement in protected activity before moving to assess Jones' coworker retaliation claim.

"To come within the protection of Title VII, [Jones] must establish that he challenged an employment practice that he reasonably believed was unlawful." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015). Importantly, "Title VII does not restrict the manner or means by which an employee may oppose an unlawful employment practice," *id.*, and complaining to other employees can qualify as protected activity, *see Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). But "Title VII does not protect an employee, however, if his opposition is merely a 'vague charge of discrimination.'" *Yazdian*, 793 F.3d at 645 (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

Jones argues that his coworkers harassed him as retaliation for the November 9, 2020 meeting in which they were told they could not use racial slurs or make racial jokes. We conclude that Jones has provided sufficient evidence to raise a dispute of material fact as to whether he engaged in protected activity at that meeting. To be sure, Jones did not call the meeting, Thornberry did. But Jones attended and participated in the meeting. Notably, Jones testified that at the meeting, he asked Fleming not to say the n-word. Thus, Jones manifested assent to Thornberry's accusations of racial harassment against his coworkers, which Jones echoed by asking his coworkers not to use racial slurs. More than a "complaint limited to an isolated comment by one employee," or a vague allegation this Court would "struggle[] to understand," Jones' participation in the meeting, where his treatment by coworkers was the subject, showed

opposition to the ongoing racial harassment he faced such that a jury could reasonably conclude that Jones challenged discrimination he believed to be unlawful. *See Yazdian*, 793 F.3d at 645–46.

Jones alleges that several of his coworkers' actions constitute retaliation for the November 9 meeting. We focus on the incident in which Bowersock threw grease on Jones' car, however, because Jones has provided sufficient evidence of coworker retaliation through that incident alone.

As an initial matter, a rational jury could find that Bowersock's grease-throwing was retaliation for the November 9 meeting. The grease incident occurred on November 10, 2020—close enough in time to Jones' participation in the November 9 meeting that the temporal proximity suffices as evidence of causation. *Cf. Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.").

Returning to the *Hawkins* test, it is also clear that the evidence of grease throwing raises a fact issue as to whether Jones' coworkers' retaliation was "sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination." 517 F.3d at 347. Construing the facts in favor of Jones, Bowersock's grease throwing was an unprovoked, physical attack that could have put Jones' safety in great jeopardy, had Jones driven his car with the grease obscuring his vision. Nevertheless, Fluor argues that the grease incident is insufficient evidence of retaliation because it was less extreme than the conduct that constituted coworker retaliation in *Hawkins*. And it is true that the conduct in *Hawkins* was extreme: The plaintiff's coworker set her car on fire at her home, a few weeks after she reported the coworker for sexual harassment. 517 F.3d at 329. But *Hawkins* does not preclude us from concluding that grease throwing likewise

27

would dissuade a reasonable worker from making or supporting a charge of discrimination. Far from a "petty slight[], minor annoyance[], [or] simple lack of good manners" that would "not create such deterrence," *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), Bowersock committed an act that interfered with Jones' safety. A factfinder could conclude that a reasonable worker in Jones' position would credibly fear further physically threatening activity were he again to oppose racial harassment.

Further, there is no question that Fluor management knew about the grease incident—because Thornberry informed Craig about it.[5] *See Hawkins*, 517 F.3d at 348. And Jones has provided sufficient evidence that Craig and Fluor management "responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Id.* at 347. Admittedly, Craig responded to the incident by meeting with Bowersock and purportedly telling him to stop harassing Jones. But the record is devoid of evidence that Craig specifically addressed the grease incident in the meeting, that Fluor further investigated the incident, or that Bowersock was subjected to formal discipline or warnings. And Craig's reproach had little impact on Bowersock's behavior. After he was talked to, Bowersock made another racial comment to Jones, and continued to ostracize Jones. Given the physical nature of the incident, and the risk Bowersock's actions posed to Jones' physical safety, a jury could find that Fluor's minimal response was insufficient. This is especially true given that Craig knew about other instances of racial harassment perpetrated by Bowersock and the night crew. *See Jackson-*

---

[5] Craig was a "supervisor" within the meaning of Title VII because he had the ability to "take tangible employment actions" such as hiring or firing. *Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). In the context of Title VII hostile work environment claims, employers can be vicariously liable for harassment perpetrated by supervisors under appropriate circumstances. *See id.* It follows that Jones has provided sufficient evidence of Fluor's liability for Bowersock's retaliatory conduct when Craig, a supervisor, knew of the conduct and reacted only by informally reprimanding Bowersock, failing to take any meaningful action.

*Quanex,* 191 F. 3d at 647 (concluding, in the context of a hostile work environment claim, that "[r]easonable minds could surely have differed" as to whether the employer-defendant "exercised reasonable care to correct racial harassment when it merely reprimanded a supervisor whose [years-long history of] offensive conduct was known to management"). Moreover, Fluor's investigation of Jones' March 2021 statement about harassment does not suffice as a response to the grease incident, since the incident was not addressed in response to the harassment investigation. *See Hawkins*, 517 F.3d at 348–49. There are, therefore, sufficient facts in the record upon which a jury could find that Fluor's failure to adequately investigate the grease incident, or monitor or discipline Bowersock in response to it, was "indifferent or unreasonable." *Id.* at 349; *cf. Szeinbach v. Ohio State Univ.*, 493 F. App'x 690, 695 (6th Cir. 2012) (concluding that a reasonable jury could find that management "condoned, tolerated, or encouraged [coworker's] acts of retaliation" despite employer's avowal that it disciplined the coworker where coworker denied receiving discipline and there was no record of discipline).

Thus, Jones has provided sufficient evidence of his coworkers' retaliatory conduct, which was known to his employer, to preclude summary judgment for Fluor on Jones' retaliation claims, and the district court erred in concluding otherwise.

## III. CONCLUSION

For the reasons set forth above, we **REVERSE** the district court's order granting summary judgment to Fluor and **REMAND** the case for further proceedings consistent with this opinion.